OPINION OF THE COURT
C. Raymond Radican, J.
This is a guardianship proceeding pursuant to section 384-b of the Social Services Law. A referee’s hearing was held on March 4, 1981 before the deputy chief clerk-referee, and his report waived.
At the hearing, there was much discussion over the introduction into evidence of the reports of the Bureau of Child Welfare of the City of New York. Subsequent to the hearing, and on the recommendation of the court, a certified copy of the report has been submitted and both attorneys have specifically consented to the introduction of such report.
The subject of this guardianship and custody proceeding is a child born on October 25, 1976. The child was born suffering from methadone withdrawal, the result of her mother’s drug addiction. The infant’s mother died on January 15, 1979 in New York City from acute methadone toxification. The certificate of birth indicates that the child’s father is one Louis Antonio M.; however, one Kenneth H. has executed an acknowledgement of paternity.
*41 In addition, there is a statement of alleged paternity signed by the mother in October, 1978 and witnessed by one Lois Nebritt, a caseworker for the Bureau of Child Welfare, which states that Kenneth H. is the father. Similarly, the mother’s statements in the Bureau of Child Welfare records, pursuant to a home visit, on May 16, 1977, indicates that Mr. M. was not the father of the baby, but rather Mr. H. Mr. H., who is presently incarcerated, has executed a consent to the adoption of the child. However, Mr. M., nevertheless, alleges he is the true father and opposes this application. The results of a blood-grouping test taken for the purpose of excluding the possibility of Mr. M. being the father have proved inconclusive.
The testimony reveals that the mother, who originally resided in Delaware, ran away as a teenager and came to New York City. She proceeded to live the life of a “street person” and became addicted to both drugs and alcohol. Apparently, the mother and Mr. H. began living together until he was sent to jail for 30 days for violating probation. At that time, the mother was two and one-half months’ pregnant and began living with Mr. M. However, upon being released from jail, Mr. H. resumed living with the mother until just before she gave birth. At the time of the birth, the mother was living with Mr. M., apparently accounting for why his name appears on the birth certificate. The baby, being born premature and suffering from methadone withdrawal, remained in the hospital until early December, 1976.
Mr. M. testified that he resided with the mother and child until June, 1978 when he was arrested. Between December, 1976 and June, 1978, social workers from the Bureau of Child Welfare made frequent home visits on which many of these occasions Mr. M. was present. The living conditions for the family were, at best, unstable. There are indications that the child was abused and that drugs and alcohol were being used by both Mr. M. and the mother. Mr. M. had no job and was on public assistance. He has a long criminal record which began in 1967. He is presently on parole following a conviction for grand larceny for which he was incarcerated commencing in November, 1979.
*42 On August 13, 1978, while Mr. M. was in prison, the child was found unattended in Tompkins Square Park, New York City, and was placed in the care of the Commissioner of Social Services of the City of New York. The infant was then placed with the petitioner, St. Christopher’s Home, on November 29, 1978, and presently lives with her foster parents who wish to adopt her.
The petitioner contends that Mr. M. is not in fact the father, but that in any event, should he be found to. be the father he has abandoned the infant pursuant to section 384-b (subd 4, par [b]) of the Social Services Law. An order committing the guardianship and custody of a child pursuant to this section may be granted on the grounds that: “The parent or parents, whose consent * * * would otherwise be required in accordance with section one hundred eleven of the domestic relations law, abandoned such child for the period of six months immediately prior to the date on which the petition is filed in the court”.
In Matter of Sonia V. R. (97 Misc 2d 694) the court held that an application under section 384-b of the Social Services Law on the ground of abandonment may not be maintained against a parent who has lost his civil rights because of imprisonment (Civil Rights Law, § 79, subd 1). This somewhat convoluted reásoning is based on the premise that abandonment can only be established against a parent “whose consent to the adoption of the child would otherwise be required in accordance with section one hundred eleven of the domestic relations law” (Social Services Law, § 384-b, subd 4, par [b]), and that since consent is not required under section 111 of a parent who has lost his civil rights, the ground of abandonment is therefore not available. Following its interpretation the court stated (p 697): “The bizarre and certainly unintended result is that despite the abandonment by a felon of his children, redress on behalf of the children on the grounds of abandonment is unavailable to them. The absurd and malefic result is that a convicted felon who has lost his civil rights in effect has greater rights than a law-abiding individual who enjoys his civil rights. Through legislative oversight, children such as these that are the subject of the petition are victimized and parents whose punishment includes the loss *43 of their civil rights are rewarded by their criminal transgressions.” Although following this persuasive argument why a literal interpretation of the statute was mischievous, the court nevertheless concluded (p 697) that “[t]his anomaly must be cured by legislation not by judicial intervention.” This court is of an opposite mind. The legislative intent behind section 384-b of the Social Services Law is clearly to provide procedures not only to protect the natural parents’ rights, but to terminate those rights where for all practical purposes the parent-child relationship has ceásed to exist. In order to sustain this manifest intention statutes are not to be read with a literalness that kills the meaning, purpose and beneficial end for which the statute has been designed (Lanvin Parfumes v Le Dans, 12 AD2d 104). To that end, courts may in a proper case depart from a literal construction and sustain the legislative intention although it is contrary to the literal letter of the statute (McKinney’s Cons Laws of NY, Book 1, Statutes, § 111). It is entirely possible that here the Legislature intended nothing more than to describe a general classification of parents against whom abandonment might be charged without in any way intending to limit the jurisdictional power of the court to proceed in a given case should it see fit. Accordingly, it is this court’s conclusion that abandonment is a viable ground for termination of parental rights under section 384-b of the Social Services Law, notwithstanding the fact that the parent has lost his civil rights because of imprisonment.
Under this section, “a child is ‘abandoned’ by his parent if such parent envinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency” (Social Services Law, § 384-b, subd 5, par [a]).
The respondent in effect argues that his imprisonment prevented him from knowing what had happened to the child following its abandonment in the park and that his subsequent efforts to locate her upon his release from prison on December 22, 1978 until he was subsequently *44 imprisoned again on November 5,1979 prevent a finding of abandonment.
Mr. M. testified that following his December, 1978 release from prison he made repeated trips to Delaware, the mother’s home, to try to find the infant and her mother. While in Delaware he would randomly stop people on the streets and question them in order to ascertain the whereabouts of the mother. However, he admits that during his search he did not contact the police or the Bureau of Child Welfare, although he knew they had been following the case. In addition, a caseworker for the agency testified that the January 5, 1979 entry in the agency records to the effect that Mr. M. refused to sign a denial of paternity indicated he knew the child was under the care of the agency. Particularly in view of this entry the court finds incredible his testimony of repeated trips to Delaware to locate the child.
The statute requires abandonment for a period of “six months immediately prior to the date on which the petition is filed in the court” (Social Services Law, § 384-b, subd 4, par [b]). For a major part of that period (from Nov. 5,1979 to Feb. 5,1980, the date of filing) Mr. M. was in prison. Can abandonment be based upon a period during which the parent is imprisoned? Insofar as section 384-b of the Social Services Law relates to permanent neglect, it is specifically provided that the time a parent is incarcerated shall not be part of a period of failure to contact, but “shall not interrupt” such period (Social Services Law, § 384-b, subd 7, par [d], cl [iii]). It would therefore appear that the respondent’s incarceration prior to the filing of the petition here can be “carved out” of the requisite six months’ abandonment required by the statute, enabling prior periods to be tacked on. Consequently, the court finds that for a period of more than six months prior to Mr. M.’s last imprisonment in November, 1979 he abandoned the infant in this proceeding and his consent, whether or not he is the actual father (a fact which the court finds unnecessary to determine), is dispensed with.
Moreover, it has been held that although incarceration might be a valid excuse for not supporting or visiting the child, it is not a valid excuse for not discharging the *45 minimal duty to communicate with the agency with reference to the welfare of the infant (Matter of Exie M.M., NYLJ, Sept. 22, 1981, p 11, col 3 [Gelfand, J.]). Here, there is evidence the father knew of the agency involved and could have communicated with it even after his incarceration in November, 1979. The father’s extensive letter writing, which has added to the court’s file, indicates he was able to communicate with outside sources, including the agency, if he were so inclined.
As noted above, section 111 (subd 2, par [d]) of the Domestic Relations Law dispenses with the necessity for the consent of a parent who has been deprived of his civil rights because of imprisonment. The case of Sonia V.R. (supra) points out that proceeding under section 111 (subd 2, par [d]) of the Domestic Relations Law may be an appropriate alternative approach to terminating parental rights, the suggestion apparently being that while loss of civil rights is not a stated ground under section 384-b of the Social Services Law (a proceeding preliminary to adoption), an adoption proceeding per se may invoke loss of civil rights as a reason to dispense with consent. While this would appear to be a literal interpretation of the law, nevertheless this court would recommend revision of section 384-b of the Social Services Law to include within it as grounds for dispensing with consent any of the grounds set forth in section 111 of the Domestic Relations Law so as to eliminate any dichotomy between the two proceedings.
As a result of his abandonment of the child and in accordance with section 384-b of the Social Services Law, the petition for guardianship and custody of the child prayed for by the petitioner is hereby granted, including the power to place the child for adoption.